UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


JAMES J. NICITA, a resident of Oregon,

        Plaintiff,

   v.

DANIEL W. HOLLADAY, in his individual
capacity; in his official capacity as mayor of the City
of Oregon City, Oregon, a municipal corporation;
and in his official capacity as a Commissioner of the
Urban Renewal Commission of Oregon City,

THE CITY OF OREGON CITY, a municipal
corporation,

and

THE URBAN RENEWAL AGENCY, an Agency of
the City of Oregon City,

        Defendants.

Case No. 3:19-CV-01960-YY

FINDINGS AND
RECOMMENDATIONS


YOU, Magistrate Judge.

## FINDINGS

Plaintiff James Nicita has brought suit against defendants Daniel Holladay, the City of

Oregon City ("Oregon City"), and the Urban Renewal Agency of Oregon City ("OCURA")

(collectively "defendants") alleging tort and constitutional claims arising out of a series of

incidents.  Plaintiff alleges he has suffered from "regular and repeated retaliatory public

harassment abuse inflicted" by defendant Holladay, and that these injuries were "ratified,

broadcast, and amplified by" defendants Oregon City and OCURA and proposed defendants

Anthony Konkol and Kattie Riggs.  Mot. Leave File Amended Compl., Ex. 1, at ¶ 4, ECF 26-1

(*hereinafter* "Prop. Second Am. Compl.").

      After oral argument on defendants' Motion to Dismiss on April 8, 2021, the court

suggested to plaintiff that he seek leave to file an amended complaint.  ECF 25.  The plaintiff did

so on May 10, 2021, and attached a Proposed Second Amended Complaint to his motion.  ECF

26, 26-1.  For the reasons discussed below, plaintiff's Motion for Leave to Amend (ECF 26)

should be denied.  Additionally, the court withdraws its prior order denying defendants' Motion

to Dismiss as moot[1] (ECF 25) and recommends that defendants' Motion to Dismiss (ECF 15)

should be granted.

## I.      Factual Background

      This lawsuit arises from at least a decade's worth of incidents between plaintiff,

defendants, and proposed defendants.  The incidents are summarized in plaintiff's Proposed

Second Amended Complaint as follows:

---

[1] In his Reply in Support of Leave to Amend, plaintiff did not reply to many of defendants' responses and instead urged the court to ignore "portions of Defendants' Response [to Plaintiff's Motion to Amend the First Amended Complaint] that seek to re-argue, with additional facts, arguments, and authority, those portions of Defendants' original" Motion to Dismiss because "[d]efendants' motion to dismiss the First Amended Complaint was denied" previously.  Reply 1, ECF 31.  As explained during oral argument, the court did not render any decision on the merits of defendants' Motion to Dismiss; the motion was denied as moot because plaintiff was permitted to seek amendment.  *See* ECF 25.  In light of this explanation, all parties agreed at oral argument that the court should evaluate the briefing as a whole in rendering its decision, including defendants' Motion to Dismiss (ECF 15), plaintiff's Response to Motion to Dismiss (ECF 16), the subsequent reply by defendants (ECF 22), and related supplemental authority filed by either party.

In 2007, shortly after plaintiff moved to Oregon City, defendant OCURA adopted an amendment to the Oregon City Urban Renewal Plan. Prop. Second Am. Compl. ¶ 11, ECF 26-1. The amendment outlined plans to develop two projects: a mall on a landfill, known as "the Rivers," and a mixed-used development surrounding Clackamette Cove, known as "the Cove." *Id.* Around this time, plaintiff decided to run for a position on the City Commission of Oregon City ("City Commission"), and made his opposition to the Rivers project and desire for more scrutiny of the Cove project a central part of his campaign platform. *Id.* ¶ 13. Plaintiff was elected to the City Commission in 2008. *Id.*

Around late 2010 or early 2011, plaintiff called for a referral of three proposed charter amendments to voters: one proposed to transfer appointment authority of the City Attorney of Oregon City from the City Manager to the City Commission, another sought to give voters the right to vote on the issuance of any urban renewal bonds, and the third sought to institute a May primary for Commission races. *Id.* ¶ 17. These proposed amendments were opposed by defendant Holladay and former Oregon City Mayor Dan Fowler, and the two sought to draw public attention toward plaintiff's proposals. *Id.* ¶ 18. Ultimately, in the face of significant public opposition, plaintiff tabled his three proposals. *Id.* Shortly thereafter, in the summer of 2011, negotiations over the Rivers project collapsed. *Id.* ¶ 22. In July 2011, Fowler and defendant Holladay initiated a recall campaign against plaintiff; plaintiff was successfully recalled on December 6, 2011. *Id.* ¶¶ 22, 25.

About two years later, on January 6, 2014, plaintiff appeared at a meeting of the Oregon City Citizen Involvement Committee to voice support for a charter amendment that would transfer appointment authority of the City Attorney from the City Manager to the City Commission. *Id.* ¶ 28. After plaintiff concluded his public comment, defendant Holladay

incorrectly stated that when the proposed amendment was previously considered in 2010, plaintiff was the only vote in favor of the proposal.  *Id.*  Plaintiff and then-Mayor Doug Neeley quickly corrected defendant Holladay, noting that in 2010, the City Commission unanimously agreed to table the proposals.  *Id.*

In November 2014, defendant Holladay was elected mayor of Oregon City.  *Id.* ¶ 29.  On February 15, 2016, plaintiff informed Oregon City staff that a report relating to a proposed hospital expansion had not been timely issued in advance of a Commission meeting, in violation of the City Code.  *Id.* ¶ 30.  Two days later, on February 17, 2016, defendant Holladay commented on the need to delay discussion of the proposed hospital expansion:

> So, I have from... a letter sent by [plaintiff]  to [Oregon City staff members] discussing [the untimely issuance of the report]. I bring to your attention that Oregon City for at least the last twenty years has been issuing its staff reports and agendas on Friday afternoon for the Wednesday following meeting. That was true in the case of the couple of years that [plaintiff] sat on the Commission. Yet for some reason at this particular point in time [plaintiff has] chosen to throw in a little wrench into this thing to make it last a couple more weeks, for what I can see as no particular good reason, just to slow things down, just to be a fly in the ointment, sand in the gears. So, that's where we are. We are going to follow the letter of the law. We're going to move it down two weeks. And we are going to do it anyway. It's once again wasting the City's time and taxpayer money for useless kinds of things. So, that's my statement as just Dan Holladay, not the mayor, not anybody else. But I'm very frustrated that this kind of stuff continues to happen by people who want to obfuscate and stop anything from happening in Oregon City.

*Id.*

In November 2017, plaintiff appealed the Planning Commission's approval of a development project known as the "Abernethy Place Hotel" to the City Commission.  During the appeal hearing, held on February 7, 2018, defendant Holladay stated, "I think we go down a dangerous road when someone makes a mission to kill a project just to kill a project."  *Id.* ¶ 37. Plaintiff demanded that defendant Holladay recuse himself from the final vote, which defendant

Holladay refused to do.  *Id.*  Shortly thereafter, the City Commission denied plaintiff's appeal[2] and assessed a total appeal fee of $7,915.50.[3]  *Id.*  A video of this City Commission meeting is public record and is available on defendant Oregon City's website and YouTube channel.  *Id.* ¶ 38.

In April 2018, the City Commission, including defendant Holladay, referred LUBA Resolution 2016-045, a case where plaintiff had successfully appealed a city decision, back to the Planning Commission.  *Id* ¶ 34.  Six months later, on November 30, 2018, defendant Holladay made a post on the "Oregon City Raw" Facebook page that included the following:

> I want to congratulate Jim Nicita on his loss again at LUBA. LUBA stands for the land use board of appeals a State Board. He has a record of I think 10 or 11 appeals and 0 wins. In this situation he is fighting against a hotel that I believe we need across from the end of the Oregon trail center. The reason? Because the person who is leading the development is Dan Fowler who exercised his constitutional and Oregon constitutional rights and used the recall process, in the city wide vote Nicita was recalled by a vote of 55% in favor of recall and 44% against. He has cost the city 1000s of dollars and much staff time on his personal vendetta against anyone who might be a leader to help our city.

*Id.* ¶ 41.

---

[2] Plaintiff appealed the Commission's denial of his appeal to the Oregon Land Use Board of Appeals (LUBA), and specifically raised questions concerning (1) the legality of the assessed appeal fee and (2) the compliance of the Abernethy Place Hotel project with various land use guidelines.  Prop. Second Am. Compl. ¶ 39, ECF 26-1.  After reviewing the record, LUBA sustained the Commission's decisions on November 30, 2018.  *Id.*  The Court of Appeals affirmed without opinion on March 20, 2019, and the Oregon Supreme Court denied plaintiff's petition for review on August 1, 2019.  *Id.*

[3] At the time of these incidents, Oregon City's local appeal fee was "$3,488.00 plus actual attorney fees."  Prop. Second Am. Compl. ¶ 35, ECF 26-1 (internal quotation omitted).  The Commission may waive the local appeal fee, although no parties has provided specifics on what factors are used in the waiver determination.  Here, the Commission denied plaintiff's request for a fee waiver and assessed $4,427.50 for actual attorney fees, totaling $7,915.50 in fees for plaintiff's local appeal.

Plaintiff alleges that defendant Holladay's statement caused him anguish and humiliation, and that he is still able to see the post despite being blocked by defendant Holladay on Facebook because others have reposted screenshots of the post.  *Id.* ¶ 43.

On February 5, 2019, plaintiff emailed his concerns surrounding recent developments in the Cove project to a city commissioner.  *Id.* ¶ 48.  The email was discussed at the next day's meeting, where defendant Holladay quipped:

> But I think it is important to understand the context in which this information comes. And Mr. Nicita has a long history in Oregon City of dropping large documents on us the night of, a couple of hours before a meeting, that might be like I said 50-75 pages long of, you know, arcane legal stuff that we are supposed to kinda try to digest and figure out what he's talking about, when at the end of the day, I think he has sued either the City or a project that the City is involved in five times and has never won a single case.
>
> So, what Mr. Nicita does is to do is try to obfuscate, delay, kill, basically anything he can to do to prevent anything good from happening in Oregon City. And that's purely my opinion, all right; it's not a statement from the Commission, it's not a statement from the mayor, it is a statement from me as an urban renewal commissioner and as an observer.
>
> I have spent thousands and thousands and thousands of volunteer hours in this community, whether it's been on the school board, the City Commission, and numerous various other things. And this guy spent a couple years and got recalled from the City Commission for just exactly this kind of stuff, where he is trying to be a lawyer at the same time he was sitting on the City Commission. It cost us thousands of hours in time and in legal fees. So when I get something from Mr. Nicita, I have a tendency to discount the veracity, and that's all I have to say.

*Id.* ¶ 49.

While plaintiff was not present at the February 6, 2019 meeting, he later watched the recording on defendant Oregon City's website.  *Id.* ¶ 50.  Plaintiff claims to have experienced intense anguish, humiliation, and distress from defendant Holladay's comments, and thereafter "sharply reduced his in-person participation in public comment" for fear of humiliation from Holladay.  *Id.*

On May 29, 2019, plaintiff delivered to defendants a tort claim notice raising state law claims of defamation, false light, and IIED arising from defendant Holladay's Facebook post and statements made at the February 6, 2019 City Commission meeting. *Id.* ¶ 52. That evening, the City Commission held a meeting, and one of the agenda items, submitted by proposed defendant Riggs, was to approve the minutes from the February 6, 2019 meeting. *Id.* Plaintiff alleges that the May 29, 2019 meeting agenda hyperlinked to draft minutes from the January 16, 2019 meeting. *Id.* Plaintiff further alleges that the "final" minutes of the February 6, 2019 meeting, which were printed on May 30, 2019, did not contain an exact transcript of defendant Holladay's defamatory statements from the meeting. *Id.*

On July 17, 2019, proposed defendant Konkol placed Resolution 19-13 on the City Commission's agenda; Resolution 19-13 sought to increase the fee to appeal a decision of the Historic Review Board and the Planning Commission. *Id.* ¶ 57. Plaintiff alleges that proposed defendant Konkol coordinated with defendant Holladay to seek this change. *Id.* Ultimately, the Commission raised the fee to appeal a Historic Review Board decision from $50.00 to $250.00, but lowered the fee to appeal a Planning Commission decision from $3763.00 to $1500.00, notwithstanding attorney fees. *Id.* ¶ 58. Over a year later, on November 10, 2020, defendant Holladay was recalled from the mayor position by Oregon City voters. *Id.* ¶ 65.

## II.    Procedural History

Plaintiff filed his initial complaint on December 2, 2019. ECF 1. He then filed a First Amended Complaint on March 2, 2020. ECF 5. The First Amended Complaint included five claims for relief: (1) a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983, (2) libel, (3) slander, (4) false light, and (5) intentional infliction of emotional distress. *See generally* First Am. Compl., ECF 5. In response, defendants filed a Motion to Dismiss all claims. ECF 15. The

court held a hearing on the motion, during which it discussed the deficiencies in plaintiff's First

Amended Complaint and denied defendant's motion to dismiss as moot in light of plaintiff's

forthcoming Motion to File an Amended Complaint.  ECF 25.

Plaintiff subsequently filed his Motion to Amend his First Amended Complaint.  ECF 26.

In comparing plaintiff's Proposed Second Amended Complaint to his First Amended Complaint,

the Proposed Second Amended Complaint contains similar facts and allegations, but adds two

more defendants, Konkol and Riggs; and adds a violation of due process claim and a *Monell*

claim.  *See generally* First Am. Compl., ECF 5; Prop. Second Am. Compl., ECF 26-1.  After

receiving briefing on plaintiff's motion, this court held oral argument on September 22, 2021.

## III.    Legal Standard

"Rule 15(a) declares that leave to amend shall be freely given when justice so requires."

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal quotation marks omitted).  When exercising

its discretion on a motion to amend, the court should be guided by the underlying purpose of

Rule 15(a), which is "to facilitate decisions on merits, rather than on the pleadings or

technicalities."  *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (citation omitted).

Such leave, however, "is not to be granted automatically."  *Jackson v. Bank of Hawaii*,

902 F.2d 1385, 1387 (9th Cir. 1990).  The court may consider factors "such as undue delay, bad

faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

the amendment, futility of amendment" and deny leave to amend on those or similar grounds.

*Foman*, 371 U.S. at 182.  Futility may support denial of a motion to amend if it is clear that the

pleading, as amended, is subject to dismissal and cannot be cured by amendment.  *United States*

*v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (citations omitted).

## IV.    Discussion

### A.    *Foman* Factors: Undue Delay, Bad Faith, Repeated Failure to Cure Deficiencies, and Unfair Prejudice to Opposing Parties

This court cannot find any significant evidence of undue delay, bad faith, repeated failure to cure deficiencies, or undue prejudice that would give pause to granting a motion to amend, and defendants do not raise these concerns. *See generally* Resp. 8-10, ECF 30. Thus, the analysis proceeds to the remaining *Foman* factor: futility.

### B.    *Foman* Factor*:* Futility

The test for futility is identical to the standard used for a motion to dismiss under Rule 12(b)(6). *Fulton v. Advantage Sales & Mktg., LLC*, No. 3:11-CV-01050-MO, 2012 WL 5182805, at *2 (D. Or. Oct. 18, 2012). A proposed amended complaint is futile if it would be immediately "subject to dismissal." *Steckman v. Hart Brewing, Inc*., 143 F.3d 1293, 1298 (9th Cir. 1998). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)). The court therefore evaluates all of plaintiff's causes of action in his Proposed Second Amended Complaint against this standard.

#### 1.    Claim 1: Libel

First, plaintiff alleges a claim of libel against defendant Holladay. Prop. Second Am. Compl. ¶¶ 67-70, ECF 26-1. Specifically, he claims that defendant Holladay's November 30, 2018 Facebook post, which alleged that plaintiff had filed "10 or 11" land use appeals with "0 wins" was false and defamatory. *Id.* ¶ 68. Plaintiff adds that defendant Holladay should have known that the "0 wins" allegation was false because defendant Holladay was present at a City Commission meeting where a successful land use appeal by plaintiff was discussed. *Id.* ¶ 70.

a.    **Relevant Law**

There exist two types of defamation claims under Oregon law: libel, which is "defamation by written or printed words," and slander, which is "defamation by spoken words." *Neumann v. Liles*, 358 Or. 706, 712 (2016). "To establish a claim for defamation, a plaintiff must show that a defendant made a defamatory statement about the plaintiff and published the statement to a third party." *Id.* at 711 (quoting *Wallulis v. Dymowski*, 323 Or. 337, 342-43 (1996)). A defamatory statement is one that would subject the plaintiff "to hatred, contempt or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the plaintiff] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the plaintiff]." *Farnsworth v. Hyde*, 266 Or. 236, 238 (1973) (internal quotation marks omitted). "To be actionable, a communication must be both false and defamatory." *Reesman v. Highfill*, 327 Or. 597, 603-04 (1998) (citing *Harley–Davidson v. Markley*, 279 Or. 361, 364 (1977)).

Additionally, defamation claims generally invoke First Amendment protections. The Ninth Circuit has held that even if state law classifies a statement as defamatory, the First Amendment, if applicable, "protects [those] statements regardless of what state law provides." *Partington v. Bugliosi*, 56 F.3d 1147, 1152 (9th Cir. 1995). Thus, before applying state law toward an allegedly defamatory statement, the court first determines whether the claim itself is actionable in light of First Amendment protections. *Id.* at 1160 n.20 ("We do not reach this [state law] issue, however, because we conclude that all of the contested statements are protected by the First Amendment and therefore are not actionable.") Oregon courts have also adopted this dual-layered approach. *See Neumann,* 358 Or. at 718.

When evaluating whether a statement is protected under the First Amendment, the court must first determine whether the statement involves a matter of public concern. *Id.* "If it does,

then the dispositive question is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Id.* at 718–19. To guide that inquiry, courts consider three factors ("*Unelko* factors"): " (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible of being proved true or false." *Id.* at 717 (citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990)). During this evaluation, the court must consider "the work as a whole, the specific context in which the statements were made, and the statements themselves." *Partington*, 56 F.3d at 1153. Finally, plaintiffs cannot base claims "upon minor factual errors when the gist of the work, taken as a whole, cannot serve as the basis for a defamation or false light claim." *Id.* at 1161.

### b.    Analysis

To qualify for First Amendment protection, defendant Holladay's Facebook post must involve a matter of public concern. The court evaluates this requirement by examining "the content, form, and context" of the statement. *Neumann*, 358 Or. at 720. Plaintiff has not disputed that the post involves matters of public concern, and this court finds that it does.[4] The

---

[4] Both parties provided briefing on the issue of whether plaintiff is a "limited public figure" for state law purposes. While that analysis is not dispositive for the First Amendment "matter of public concern" analysis, the court's determination is bolstered by a conclusion that plaintiff is a "limited public figure" on the issue of Oregon City land use appeals. Three factors are used to evaluate whether a plaintiff is a limited public figure: (1) whether a present public controversy existed when the allegedly defamatory statements were made; (2) whether the allegedly defamatory statements were related to the plaintiff's participation in that controversy, and (3) whether the plaintiff voluntarily placed himself into the controversy to influence the controversy's ultimate resolution. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351-52 (1974); *Wheeler v. Green*, 286 Or. 99, 116-17 (1999). Plaintiff meets this test: (1) the controversy related to plaintiff's frequent land use appeals of public projects, (2) the statements described plaintiff's participation in the filing of those appeals, and (3) the plaintiff "thrust[ed] himself into

contents of the post convey information that is of general interest, including the status of a

community development project, local government affairs, and an attorney's record in appealing

land use decisions.  *See Unelko*, 912 F.2d at 1056 (finding that a statement on "60 Minutes" that

a consumer product "didn't work" involved a matter of public concern).  While the post was

made in the "Oregon City Raw" Facebook group, plaintiff describes the group as a "social media

site" and its members as "subscribers."  Prop. Second Am. Compl. ¶¶ 40-41, ECF 26-1.  Simply

put, the contents of the post were of general interest to Oregon City community members, and

the post was made within a Facebook group with participants that possessed interest in Oregon

City affairs.  It therefore qualifies as a matter of public concern for First Amendment purposes.

Because the post qualifies as a matter of public concern, the court proceeds to the three-

factor *Unelko* analysis.[5]  The first consideration, "whether the general tenor of the entire work

---

the vortex of this public issue" by filing these appeals and working to draw public attention to his
work.  *Gertz*, 418 U.S. at 352.

       While plaintiff alleges that his participation in public land use affairs is involuntary
through his role as a "land use attorney and [] private citizen", that argument understates the
nature of plaintiff's participation in land use issues as even he has described it.  In his Proposed
Second Amended Complaint, plaintiff alleges that over the course of these events, he has: helped
organize and collect signatures for multiple campaigns petitioning for a voter initiative on the
issuance of urban renewal bonds, run for public office with a campaign platform featuring land
use concerns, sought charter amendments granting citizens a vote on the issuance of urban
renewal bonds, and provided significant public comment on urban renewal issues as both an
elected City Commissioner and as a private citizen.  Prop. Second Am. Compl. ¶¶ 12-13, 17, 19,
30, 37, 48, ECF 26-1.  Even if the court accepted plaintiff's assertion that his attorney work
requires him to appear at land use proceedings, his representation does not include the significant
efforts he has voluntarily undertaken to bring public attention to urban development issues in
Oregon City.

[5] In his response to defendants' original Motion to Dismiss (ECF 15), plaintiff alleges that "the
*Partington* analysis should not be undertaken until appropriate discovery and/or trial."  Reply 10,
ECF 16.  However, plaintiff fails to offer any legal authority for this assertion, and a cursory
search reveals numerous cases within this district where judges applied the *Unelko* analysis
(which *Partington* cites to and employs) prior to discovery or trial.  *See, e.g.*, *Dossett v. Ho-
Chunk, Inc.*, 472 F. Supp. 3d 900, 913-14 (D. Or. 2020) (applying the framework on a motion to
dismiss); *Card v. Pipes*, 398 F. Supp. 2d 1126, 1135 (D. Or. 2004) (same).

negates the impression that the defendant was asserting an objective fact," weighs in defendant

Holladay's favor. The setting of the post is a "social media site"; one would generally expect

posts on Facebook to contain more opinion than factual content. Prop. Second Am. Compl. ¶¶

40, ECF 26-1; *see also Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 727 (1st

Cir. 1992) (holding that a critical musical review was "the type of article generally known to

contain more opinionated writing than the typical news report"). While this finding is somewhat

undercut by plaintiff's assertion that defendant Holladay "participated in the group on his official

mayor's page", *see* Prop. Second Am. Compl. ¶ 40, ECF 26-1, the opening words of the post

itself—sarcastically congratulating plaintiff for losing a land use appeal—amplifies an

impression that the post is primarily opinion.

 The contents of the post do not dislodge that initial impression. After describing his

understanding of plaintiff's success in land use appeals, defendant Holladay expresses his

opinion, based on his relationship with plaintiff, for why plaintiff sought this appeal. When an

individual who "writes about a controversial occurrence fairly describes the general events

involved and offers his personal perspective about some of its ambiguities and disputed facts, his

statements should generally be protected by the First Amendment." *Partington*, 56 F.3d at 1154.

"Otherwise, there would be no room for expressions of opinion by commentators, experts in a

field, figures closely involved in a public controversy, or others whose perspectives might be of

interest to the public." Here, while defendant Holladay's post misstates plaintiff's appeals

record, the statement as a whole describes plaintiff's numerous actions in Oregon City local

government and signals his frustration with how plaintiff's actions consume city resources. This

belief is clearly subjective, and the general tenor of the post signals that it is primarily opinion.

Moreover, the offending words that plaintiff highlights as untrue—that he has "0 wins" in land use appeals—is preceded with a qualifying limitation: "I think."  Prop. Second Am. Compl. ¶ 41, ECF 26-1.  While the qualifying phrase does not completely shield defendant Holladay of responsibility, its immediate placement before a numerical term suggests, to a reasonable reader, that he is estimating the plaintiff's record in land use appeals.  The inclusion of a qualifying phrase is particularly notable given that three sentences later, defendant Holladay provides statistics on plaintiff's recall *without* a similar phrase.  *Id.*  Contextually, this suggests that defendant Holladay was certain about statistics associated with plaintiff's recall, while also estimating plaintiff's record in land use appeals.  Thus, through the analysis above, the first *Unelko* factor weighs in defendant Holladay's favor.

The remaining two factors—"whether the defendant used figurative or hyperbolic language that negates that impression" and "whether the statement in question is susceptible of being proved true or false" do not favor either party.  There are certain terms within the post that are capable of hyperbolic meaning, but the present motion requires the court to construe all reasonable facts in plaintiff's favor.  Similarly, while much of the content in defendant Holladay's post are opinion, some statements are capable of being proved true or false, including plaintiff's land use appeals record, the margin of plaintiff's recall election, and the amount of city resources dedicated toward addressing plaintiff's requests.  Both these factors do not move the needle for either plaintiff or defendant Holladay.

A final, overarching consideration is that the court must review not only "the work as a whole" and the "statements themselves," but also "the specific context in which the statements were made."  *Partington*, 56 F.3d at 1153.  Defendant Holladay made this post within the same "Oregon City Raw" Facebook group where plaintiff *himself* had previously "criticized

[defendant] Holladay on a number of issues." Prop. Second Am. Compl. ¶ 40, ECF 26-1. The court is obviously not implying that a tit-for-tat dispute on social media legitimizes potentially actionable defamation. However, this additional context supports the conclusion that a reasonable factfinder, taking the aforementioned context and analysis into account, would not conclude that the Facebook post "implies an assertion of objective fact."[6]

The Ninth Circuit has made clear that plaintiffs cannot base allegations "upon minor factual errors when the gist of the work, taken as a whole, cannot serve as the basis for a defamation or false light claim." *Partington*, 56 F.3d at 1161. Therefore, defendant Holladay's Facebook post is protected under the First Amendment and is not actionable.

## 2.    Claim 2: Slander

Next, plaintiff alleges a claim of slander against multiple defendants. Prop. Second Am. Compl. ¶¶ 71-76, ECF 26-1. Specifically, he identifies five allegedly slanderous statements made by defendant Holladay at the February 6, 2019 City Commission meeting: (1) plaintiff sued Oregon City "five times and never one [sic] a single case," (2) plaintiff was trying to "obfuscate, delay, kill, basically anything he can to do to prevent anything good from happening

---

[6] In supplemental authority after oral argument, plaintiff suggested that the Oregon Supreme Court's decision in *Chief Aircraft, Inc. v. Grill*, 288 Or. App. 729 (2017), provides useful analysis about whether a statement can be construed as opinion. Not. Second Supp. Auth. 3-4, ECF 34. As an initial matter, the court observes that it allowed plaintiff leave to submit additional authority on a completely different issue that plaintiff fails to address. Moreover, the Oregon Supreme Court's decision is not new authority. *Grill* was decided in 2017—nearly four years before plaintiff filed his Proposed Second Amended Complaint. Finally, *Grill* incorporates the *Neumann* three-part test described above, which the court uses to evaluate defendant Holladay's First Amendment protections. 358 Or. at 717. In any event, *Grill* is helpful because it finds that implied assertions of objective fact that are actually false do not qualify for First Amendment protections if they are made on a website that "does not negate the impression that defendant is asserting an objective fact." Unlike the defendant in *Grill*, who posted a statement on a consumer review website titled "Ripoff Report," defendant Holladay made this post on a social media site and couched the allegedly defamatory statement with a phrase that qualifies his statement as an estimation.

in Oregon City," (3) plaintiff got recalled for "filing land use appeals and making public comment on public questions," (4) plaintiff was "trying to be a lawyer at the same time he was sitting on the City Commission," and (5) plaintiff's efforts "cost the City thousands of hours in time and in legal fees." *Id.* ¶ 73. Plaintiff adds that defendant Holladay should have known the allegation he had "never [won] a single case" was false because defendant Holladay was present at a City Commission meeting where a successful land use appeal by plaintiff was discussed, and because defendant Holladay had previously commented on plaintiff's December 1, 2018 Facebook post in which plaintiff stated that he had prevailed on an appeal against Oregon City. *Id.* ¶ 75. Plaintiff further claims that defendants Oregon City and OCURA contributed to the alleged slander by maintaining videos of City Commission meetings, which include recordings of defendant Holladay's comments, on Oregon City's official websites and social media channels. *Id.* ¶ 76.

### a.    Relevant Law

Slander, which is "defamation by spoken words," is a tort under Oregon law. *Neumann*, 358 Or. at 716. As stated earlier, "[t]o establish a claim for defamation, a plaintiff must show that a defendant made a defamatory statement about the plaintiff and published the statement to a third party." *Id.* at 711 (quoting *Wallulis*, 323 Or. at 342-43). A defamatory statement is one that would subject the plaintiff "to hatred, contempt or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the plaintiff] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the plaintiff]." *Farnsworth*, 266 Or. at 238 (internal quotation marks omitted). "To be actionable, a communication must be both false and defamatory." *Reesman*, 327 Or. at 603-04  (citing *Harley–Davidson*, 279 Or. at 364).

16 – FINDINGS AND RECOMMENDATIONS

Additionally, it is "well settled that the First Amendment protects statements of opinion that do not contain or imply provable factual assertions." *Dossett v. Ho-Chunk, Inc*., 472 F. Supp. 3d 900, 913 (D. Or. 2020) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20-21 (1990)). "The dispositive question in determining whether a defamatory statement is constitutionally protected . . . is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact about the plaintiff." *Neumann*, 358 Or. at 715 (citing *Milkovich*, 497 U.S., at 21). As discussed in the libel analysis above, the First Amendment analysis contains three factors: " (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible of being proved true or false." *Id.* at 717 (citing *Unelko*, 912 F.2d at 1053).

### b.    Analysis

As an initial matter, plaintiff fails to plead any facts suggesting that four of the five allegedly slanderous statements that defendant Holladay made are in fact false: plaintiff does not rebut defendant Holladay's statements that plaintiff was trying to "obfuscate, delay, kill, basically anything he can to do to prevent anything good from happening in Oregon City," that plaintiff got recalled for "filing land use appeals and making public comment on public questions," that plaintiff was "trying to be a lawyer at the same time he was sitting on the City Commission," and that plaintiff's efforts "cost the City thousands of hours in time and in legal fees." Prop. Second Am. Compl. ¶ 73, ECF 26-1. "To be actionable, a communication must be both false and defamatory." *Reesman*, 327 Or. 597, 603-04 (1998) (citing *Harley–Davidson*, 279 Or. at 364 (1977)). Plaintiff's failure to plead facts suggesting these statements are false, along

with his failure to plead facts suggesting that these statements are not primarily opinion, requires dismissal of his slander claim, at least as to these four allegations.

That leaves defendant Holladay's statement that plaintiff sued Oregon City "five times and never [won] a single case." Prop. Second Am. Compl. ¶ 73, ECF 26-1. Plaintiff alleges this statement is false and that defendant Holladay should have known it was false. However, this allegation fails for the same reason that plaintiff's libel claim did: the First Amendment renders the statement unactionable. While the setting of the alleged defamation has shifted from a written Facebook post (in the libel claim) to verbal comments made at a City Commission meeting (the present slander claim), the *Unelko* considerations remain in favor of defendant Holladay. Specifically, the tenor of defendant Holladay's statement conveys his subjective impression, based on "thousands and thousands and thousands of volunteer hours in this community," that plaintiff's behavior hinders progress in Oregon City. *Id.* ¶ 51, ECF 26-1. The setting of the statement—made in direct response to plaintiff's public comment at a City Council meeting—furthers an impression that defendant Holladay's comment primarily expressed his personal views about the plaintiff. And again, though not dispositive, defendant Holladay classifies his comments as "purely [his personal] opinion" and couches his estimates pertaining to plaintiff's lawsuits against Oregon City with the term "I think." *Id.* A reasonable factfinder, taking into account the analysis above, would not conclude that defendant Holladay's comments imply "an assertion of objective fact."

The Ninth Circuit has made clear that plaintiffs cannot base allegations "upon minor factual errors when the gist of the work, taken as a whole, cannot serve as the basis for a defamation or false light claim." *Partington*, 56 F.3d at 1161. Therefore, defendant Holladay's comments are protected under the First Amendment and are not actionable. Because defendant

Holladay's statements do not constitute slander, plaintiff's related claims against defendants

Oregon City and OCURA for broadcasting defendant Holladay's statement also fail.

### 3.    Claim 3: False Light

Next, plaintiff alleges the tort of false light.  He specifically attributes two incidents as

the bases for his false light claim: Holladay's Facebook post that serves as the basis for his libel

claim, and Holladay's comments at the City Commission meeting that serve as the basis for his

slander claim.  Prop. Second Am. Compl. ¶ 79.  Plaintiff further alleges that defendant Oregon

City and proposed defendant OCURA contributed to the alleged false light by maintaining

recorded videos of Commission meetings on official websites or social media channels.  *Id.* ¶ 82.

### a.    Legal Standard

Under Oregon law, false light has three elements: "(1) the defendant gave publicity to a

matter concerning the plaintiff that places the plaintiff before the public in a false light; (2) the

false light in which the plaintiff was placed would be highly offensive to a reasonable person;

and (3) the defendant had knowledge of or acted in reckless disregard as to the falsity of the

publicized matter and the false light in which the plaintiff would be placed."  *Robillard v. Opal*

*Labs, Inc*., 337 F. Supp. 3d 962, 971 (D. Or. 2018) (citing *Marleau v. Truck Ins. Exch*., 333 Or.

82, 92 (2001)).  In addition to the above elements, the *Unelko* analysis regarding First

Amendment protections remains applicable for this claim.  *Partington*, 56 F.3d at 1160

(dismissing a false light claim based on the same facts as a defamation claim because they are

"protected by the First Amendment, regardless of the tort alleged").

### b.    Analysis

Plaintiff's allegations, when construed in the light most favorable to him, establish the

basic elements of a false light claim.  Defendant Holladay made some statements about

plaintiff's record and history that were inaccurate, the statements could be construed as highly offensive to a reasonable person, and defendant Holladay was previously presented with information that made his statements untruthful.

However, the court must dismiss plaintiff's false light claim for the same reason it rejected his libel and slander claims based on the same statements: both the Facebook post and the comments at the City Commission meeting are protected by the First Amendment, regardless of whether the tort is characterized as defamation or false light. *Id.* A "plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994) (citing *Moldea v. New York Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir. 1994). Thus, plaintiff has failed to sufficiently plead a false light claim against defendant Holladay. Because defendant Holladay's statements do not constitute false light, plaintiff's false light claims against defendants Oregon City and OCURA for broadcasting defendant Holladay's statement also fail.

### 4.    Claim 4: IIED

Plaintiff next alleges an intentional infliction of emotional distress (IIED) claim against certain defendants. Though he does not identify any specific incidents that form the basis of his IIED claim, plaintiff alleges that defendant Holladay's actions caused "severe mental and emotional distress" and that defendant Holladay intended to inflict such distress. Prop. Second Am. Compl. ¶¶ 84, 87, ECF 26-1. Plaintiff further alleges that defendant Oregon City and proposed defendant OCURA contributed to his emotional distress by maintaining recorded videos of the City Commission meetings on official websites or social media channels. *Id.* ¶ 82.

a.      **Legal Standard**

To prevail on an IIED claim, plaintiff must establish that: (1) defendants "intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress;" (2) defendants "engaged in outrageous conduct, i.e. conduct extraordinarily beyond the bounds of socially tolerable behavior'"; and (3) such "conduct in fact caused plaintiff severe emotional distress." *House v. Hicks*, 218 Or. App. 348, 357-58 (2008) (internal citation omitted). While "the inquiry is fact specific, the question of whether the defendant's conduct exceeded the farthest reaches of socially tolerable behavior is, initially, a question of law." *Gordon v. Kleinfelder W., Inc.*, No. 03:11–CV–00245–HU, 2012 WL 844200 at *14 (D. Or. Mar. 12, 2012) (citation and internal quotation marks omitted).

Harsh or intimidating words that are merely "rude, boorish, tyrannical, churlish and mean" are not enough to support a claim for IIED. *Schoen v. Freightliner, LLC*, 224 Or. App. 613, 626–27 (2008) (citing *Kraemer v. Harding*, 159 Or. App. 90, 110 (1999)). Instead, courts tend to only find liability "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *House*, 218 Or. App. at 358 (internal quotation omitted).

Lastly, though not essential elements of an IIED claim, factors relevant to the inquiry include whether a "special relationship" existed between plaintiff and defendants, the setting in which the conduct allegedly occurred, and whether defendants' conduct was undertaken to take advantage of a particularly vulnerable individual. *Delaney v. Clifton*, 180 Or. App. 119 (2002).

b.        **Analysis: Special Relationship**

As an initial matter, plaintiff contends that at the time of the allegedly tortious conduct,

he and defendant Holladay held a special relationship, specifically "that of mayor and

constituent."  Prop. Second Am. Compl. ¶ 88, ECF 26-1.  There exists no precedent in Oregon or

Ninth Circuit law recognizing a special relationship between a government official and

constituents solely by virtue of representative governance.  However, the lack of a controlling

case is not completely dispositive.  Because no Oregon court has directly addressed this issue,

the court's task is to "predict how the highest state court would decide the issue using

intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and

restatements as guidance."  *Lewis v. Telephone Employees Credit Union*, 87 F.3d 1537, 1545

(9th Cir. 1996).

Under Oregon law, the elements of a special relationship in the IIED context are:

(1) [O]ne party relinquishes over matters, usually financial, and entrusts them to
the other party; (2) the party with special control is authorized to exercise
independent judgment; (3) in order to further the other party's interest; and (4) the
relationship either is, or resembles, other relationships in which the law imposes a
duty on parties to conduct themselves reasonably, so as to protect the other parties
to the relationship.

*Bell v. Public Employees Retirement Bd.*, 239 Or. App. 239, 326 (2010) (citing *Conway v.*

*Pacific Univ.*, 324 Or. 231 (1996); *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149 (1992)).

"The common thread among special relationships—that is, those warranting a heightened

duty of care—is that the party who owes a duty has a *special responsibility* toward the other

party."  *Shin v. Sunriver Preparatory Sch., Inc*., 199 Or. App. 352, 367 (2005) (emphasis in

original).  When evaluating the existence of a special relationship, Oregon courts "focus on one

party's ability to exercise independent judgment on another party's behalf in order to advance

that party's interests." *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1229 (D. Or. 2016), *aff'd*, 925 F.3d 1133 (9th Cir. 2019) (citing *Bell*, 239 Or. App. at 249).

Plaintiff has not alleged that defendant Holladay exercised independent judgment on plaintiff's behalf or to further his individual interests. Even construing the facts in the light most favorable to plaintiff, the relationship between an elected public official and his constituent cannot be characterized as anywhere close to that of an employer-employee relationship or an insurer-insured relationship, which closely resemble relationships that Oregon courts have found to constitute a special relationship.[7] *See, e.g.*, *McManus v. Auchincloss*, 271 Or. App. 765, 781 (2015). Thus, for the purposes of this IIED analysis, there exists no special relationship between plaintiff and defendant Holladay.

### c.    Analysis: Conduct

Oregon law requires conduct to rise to the level of "outrageous in the extreme" to constitute IIED. *Shay*, 131 Or. App. at 273. As an illustration of this very high bar, Oregon courts have found that even patently felonious conduct does not necessarily rise to the level of an IIED claim. *Id.* And, as stated earlier, words that are merely "rude, boorish, tyrannical, churlish and mean" cannot substantiate an IIED claim under Oregon law. *Kraemer*, 159 Or. App. at 110.

---

[7] In his response to defendants' original Motion to Dismiss (ECF 15), plaintiff notes that *House*, 218 Or. App. at 360, cites, *inter alia*, to *Williams v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 153 Or. App. 686, 688 (1998). Reply 13, ECF 16. Plaintiff alleges that *Williams* represents a case where a reviewing court found a special relationship "involving a government official and a citizen." *Id. House*, however, makes clear that *Williams* involves a special relationship between a "government *employee* and a disabled citizen." *House*, 218 Or. App. at 360 (emphasis added). The government employee in *House* was a municipal bus driver, not a government official; moreover, the *Williams* court found a special relationship existed between the plaintiff and the driver at the time of the incident because the *individual* driver served as an immediate and direct "provider of special transportation" to the plaintiff. *Williams*, 153 Or. App. at 693. Plaintiff fails to allege how defendant Holladay, by virtue of his status as a government official, holds any similar special relationship.

Here, even when construing the facts in the light most favorable to plaintiff, defendant

Holladay's comments do not "go beyond all possible bounds of decency," nor can they "be

regarded as atrocious, and utterly intolerable in a civilized community." *House*, 218 Or. App. at

358. They may be construed by a reasonable person as mean and perhaps even rude, but those

descriptions are not enough to substantiate an IIED claim under Oregon law. *Schoen*, 224 Or.

App. at 626–27. The additional factors recommended in *Delaney* offer little assistance to

plaintiff's claim. 180 Or. App. at 119. Specifically, (1) there existed no special relationship

between plaintiff and defendant Holladay; and (2) some of the conduct occurred at a public City

Commission meeting, which is arguably the exemplar of an "uninhibited marketplace of ideas"

in which the First Amendment is protected. And while plaintiff alleges that he suffers from

numerous mental health disorders, *see* Prop. Second Am. Compl. ¶ 4, ECF 26-1, he has failed to

plead with any specificity how defendant Holladay knew or should have known of these

disorders, let alone he "t[ook] advantage" of plaintiff's condition. *Delaney*, 180 Or. App. at 119.

Thus, plaintiff has failed to sufficiently plead an IIED claim against defendant Holladay.

Because defendant Holladay's actions do not constitute IIED, plaintiff's IIED claim against

defendants Oregon City and OCURA for broadcasting defendant Holladay's actions also fail.

### 5.    Claim 5: First Amendment

Plaintiff next alleges multiple violations to his First Amendment rights. Prop. Second

Am. Compl. ¶¶ 91-100, ECF 26-1. He specifically pleads violations originating from: (1)

defendant Holladay's alleged campaign of retaliation against him, and (2) proposed defendant

Konkol's decision to docket a City Commission resolution to increase the fee to appeal land use

decisions. *Id.* ¶ 93-94.

#### a.    Legal Standard

Constituents have an "enormous first amendment interest in directing speech about public issues to those who govern their city." *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990).  To state a First Amendment retaliation claim against a government official, a plaintiff must sufficiently plead that "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist*., 608 F.3d 540, 543 (9th Cir. 2010).

#### b.    Analysis: Campaign of Retaliation

Plaintiff first contends that defendant Holladay's actions constitute a "campaign of harassment and humiliation" in retaliation for his protected First Amendment expression.  Prop. Second Am. Compl. ¶ 94, ECF 26-1.  He specifically pleads that defendant Holladay's repeated defamation, vote to impose attorneys' fees as a cost for plaintiff's land use appeals, and refusal to recuse himself from voting on plaintiff's Abernethy Place Hotel appeal are representative of this retaliatory campaign.  *Id.*  The court will analyze each of the component parts of the alleged campaign, and then addresses the alleged campaign as a whole.

#### i.    Retaliation: Abusive and Defamatory Language

Plaintiff alleges that defendant Holladay retaliated against his expression of First Amendment rights by criticizing him with "abusive and defamatory" language during City Commission meetings.  *Id.*  Plaintiff adds that there exists a "causal connection" between defendant Holladay's retaliatory animus, which included harsh criticism, and plaintiff's attempt

to "criticize defendant Holladay[] and to provide information to elected officials in order to provide citizen accountability." *Id.* ¶ 95.

As an initial matter, plaintiff alleges that "[n]umerous individuals refrain from participating in City Commission public comments for fear of public humiliation at Holladay's hands." *Id.* ¶ 94. However, plaintiff does not have standing to seek damages for harms inflicted on unnamed third parties. *See Warth v. Seldin*, 422 U.S. 490, 499-500 (1975) (holding that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Furthermore, the allegation of a pattern of behavior that chills the First Amendment rights of others is not essential to plaintiff's pursuit of his individual First Amendment claim. Thus, plaintiff's claims surrounding violations committed against other parties must be dismissed.

Defendants do not dispute that plaintiff was engaged in a constitutionally protected activity (speaking during public comment), but argue there was no causal connection between defendant Holladay's criticism and alleged harm to plaintiff's constitutional rights. Resp. 21-22, ECF 30. Plaintiff, however, does plead that defendant Holladay's criticism was so harsh that "it was several months . . . before Petitioner dared go back to make public comment." Prop. Second Am. Comp. ¶ 94, ECF 26-1. The court must accept the facts alleged as true, and thus must assume that defendant Holladay's criticism did affect plaintiff in this manner.

The Ninth Circuit has held, though, that when the alleged adverse action is speech from a public official, "mere threats and harsh words" and statements causing reputational harm are not sufficient to state a claim for an adverse action. *Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016 (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998)). In the absence of "state action affecting [a plaintiff's] rights, benefits, relationship or status with the state," an act

of defamation from government officials is insufficient for relief under the First Amendment. *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994). This conclusion holds even if the plaintiff suffers harm because of the defamatory statements, such as if a private employer fires an employee because of the derogatory comments. *Mulligan*, 835 F.3d at 988-89.

Defendant Holladay's allegedly adverse actions are speech, and thus the Ninth Circuit's "high bar" for speech-as-retaliation applies. *Id.* at 989. Plaintiff does not meet this high bar. While defendant Holladay's comments embarrassed plaintiff, they do not amount to more than the "mere threats and harsh words" that were found insufficient to state a First Amendment retaliation claim in *Mulligan*. "It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation." *Nunez*, 147 F.3d at 875.

### ii.    Retaliation: Denial of Fee Waiver

Plaintiff next alleges that defendant Holladay retaliated against his expression of First Amendment rights by voting to "impose an onerous appeal fee" related to the Abernethy Place Hotel proceedings. Prop. Second Am. Compl. ¶ 94, ECF 26-1. Oregon City charges a fee of "$3,488.00 plus actual attorney fees" for appeals of local commissions. *Id.* ¶ 35. The Commission may waive the local appeal fee; however, in this case, the Commission denied plaintiff's request for a fee waiver and  assessed $4,427.50 for actual attorney fees, totaling $7,915.50 in fees for plaintiff's local appeal. *Id.* Plaintiff alleges that defendant Holladay's vote to deny his fee waiver request was in retaliation for his protected speech. *Id.* ¶ 94.

Neither party has provided legal authority on whether the imposition of administrative fees directly upon a plaintiff after the plaintiff engaged in protected conduct constitutes adverse action that would "chill a person of ordinary firmness" to allege a First Amendment retaliation claim. *Blair*, 608 F.3d at 543. This court has found one: in *Carey v. City of Wilkes-Barre*, a

plaintiff alleged a First Amendment retaliation claim where the city government imposed attorney's fees in excess of $11,000 after plaintiff withdrew her referendum petition and ceased seeking signatures.  No. 3:05-2093, 2008 WL 11492767 at *1 (M.D. Pa. Feb. 1, 2008), *report and recommendation adopted*, 2008 WL 11492789 (M.D. Pa. Feb. 21, 2008).  The court found the imposition of administrative fees constituted retaliation on two key grounds: first, there was no statutory basis for imposing attorney's fees in response to the withdrawal of a referendum petition, and second, a reviewing state court overturned imposition of the fees.  *Id.* at *6.

In the present matter, the *opposite* is true: first, plaintiff acknowledges there are existing fee structures and mechanisms to request a waiver, *see* Prop. Second Am. Compl. ¶ 36,  ECF 26-1, and so a vote to deny a waiver and imposes fees is allowed under Oregon City's laws. Second, plaintiff has already sought review in state courts of the constitutionality of the Commission's fee imposition: LUBA sustained the decision, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied plaintiff's petition for review. *Id.* ¶ 39.  Thus, because the denial of plaintiff's fee waiver was consistent with applicable laws, and because multiple reviewing courts ruled against plaintiff's challenges to the imposition of the fee, defendant Holladay's single vote to deny plaintiff's waiver does not constitute an act that would "chill a person of ordinary firmness" and substantiate a First Amendment retaliation claim.  *Blair*, 608 F.3d at 543.

### iii.    Retaliation: Failure to Recuse

Next, plaintiff alleges that defendant Holladay's refusal to recuse himself from voting on the appeal of the Abernethy Place Hotel decision constituted retaliation against his First Amendment rights.  However, plaintiff has provided no legal authority in support of the proposition that a government official's refusal to recuse from voting is sufficient to raise a First

Amendment retaliation claim.[8]  Indeed, many courts have held that "the denial of a grievance or administrative appeal does not amount to an adverse action sufficient to deter a person of ordinary firmness from further First Amendment activities."  *Garcia v. Sleeley*, No. 314CV01525JLSRBM, 2019 WL 2234789, at *9 (S.D. Cal. May 22, 2019), *report and recommendation adopted*, No. 14-CV-1525 JLS (RBM), 2019 WL 3887340 (S.D. Cal. Aug. 19, 2019), *aff'd sub nom.*, 854 F. App'x 882 (9th Cir. 2021); *see also Emory v. Nooth*, No. 2:18-cv-02096-MC, 2021 WL 1321292, at *3 (D. Or. Apr. 8, 2021) (same); *Burgos v. Canino*, 641 F. Supp. 2d 443, 454-55 (E.D. Pa.) (finding that the "mere denial of grievances" does not constitute adverse action for purposes of a retaliation claim), *aff'd*, 358 Fed. App'x 302 (3d Cir. 2009).[9] Similarly, the failure of *one* official on a *multi-member board* to recuse from voting to grant or deny an appeal cannot substantiate a First Amendment retaliation claim.

### iv.    Overall Campaign

Plaintiff alleges that defendant Holladay's actions, described above, constitute a "campaign of harassment and humiliation" in retaliation for his protected First Amendment

---

[8] In supplemental briefing provided after oral argument, plaintiff submitted LUBA opinions that "required remand of quasi-judicial land use proceedings to determine whether the bias of one or more elected officials, including personal bias against individuals, influenced the votes of other elected officials voting on the same matter."  *See* Am. Not. Second Supp. Auth. 4-5, ECF 35. However, a potential violation of LUBA's impartiality requirements is not necessarily an act that could "chill a person of ordinary firmness" in the context of a First Amendment retaliation claim, and plaintiff has failed to plead any affirmative statutes or caselaw suggesting it is.  *Blair*, 608 F.3d at 543.  More importantly, plaintiff has already sought LUBA review of the legitimacy of the Commission's actions in this matter, and LUBA ruled against plaintiff; LUBA's decision was affirmed without opinion by the Oregon Court of Appeals, and the Oregon Supreme Court denied plaintiff's petition for review.  Prop. Second Am. Compl. ¶ 39, ECF 26-1.

[9] Many of the cases in this line of authority arise from of the denial of administrative appeals in the prison context.  Despite the slightly different context, the court finds them persuasive because they clearly analyze whether a First Amendment retaliation claim can be created through the denial of an administrative appeal.  Moreover, the injuries suffered through the denial of a prison appeal are arguably equal to, if not more acute, than the injuries inflicted through the refusal of a City Commissioner to recuse himself from a vote on whether to grant an appeal.

expression.  Prop. Second Am. Compl. ¶ 96, ECF 26-1.  In support of this claim, he primarily

relies on *Coszalter v. City of Salem*, 320 F.3d 968 (2003), and *Greisen v. Hanken*, 925 F.3d 1097

(2019).  It is true that the courts in *Coszalter* and *Greisen* respectively found that a retaliation

claim can be based on retaliatory speech if the speech is either (1) part of a campaign of

harassment designed to burden the plaintiff's protected speech, or (2) the speech suggests that

punishment or adverse action would follow.  *See generally id.*  However, the retaliatory action in

both cases was adverse employment action, a harm that clearly sounds in the register of adverse

actions.

Here, as noted above, defendant Holladay's allegedly adverse actions—humiliating

speech, a vote to deny a fee waiver, and refusal to recuse himself from an appeal vote—are each

insufficient to substantiate a First Amendment retaliation claim on their own, let alone a

campaign.  Moreover, the "marketplace of ideas is undermined if public officials are prevented

from responding to speech of citizens with speech of their own."  *Mulligan*, 835 F.3d at 989.

Restricting the ability of government decisionmakers to engage in speech risks interfering with

their ability to effectively perform their duties and ignores the competing First Amendment

rights of the officials themselves.  Accordingly, the Ninth Circuit has set a "high bar" when

analyzing whether speech from government officials constitutes a First Amendment retaliation

claim.  *Id.*; *see also German v. Eudaly*, No. 3:17-CV-2028-MO, 2018 WL 3212020, at *2 (D. Or.

June 29, 2018) (finding that a Portland Commissioner's actions, which allegedly included

disparaging, harassing, and embarrassing a constituent through Facebook posts, comments, and a

self-created "garbage song" likening the constituent to trash, did not constitute a campaign of

harassment).  Plaintiff has failed to clear this bar.

c.        **Analysis: Fee Raise Resolution**

Plaintiff additionally alleges that proposed defendant Konkol violated his First

Amendment free speech rights by introducing and agendizing a resolution to raise fees for

appealing the decisions of the Historic Review Board and the Planning Commission.  Prop.

Second Am. Compl. ¶ 98, ECF 26-1.  He encourages the court to apply the three-prong test

articulated in *Blair*, 608 F.3d at 543, and described above.  *Id.* ¶ 99.

However, even before applying the *Blair* analysis, the court must address the threshold

issue of standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The

"irreducible constitutional minimum of standing" requires the party invoking federal jurisdiction

to establish three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not conjectural or hypothetical. Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to
> be fairly traceable to the challenged action of the defendant, and not the result of
> the independent action of some third party not before the court. Third, it must be
> likely, as opposed to merely speculative, that the injury will be redressed by a
> favorable decision.

*Id.* at 560-61 (1992) (internal citations, ellipses, and quotation marks omitted).

Here, plaintiff has failed to establish an injury-in-fact from either of the fee raises that

proposed defendant Konkol suggested.  First, as plaintiff admitted during oral argument, the City

Commission ultimately voted to *lower* the cost to appeal a decision of the Planning Commission.

*Id.* ¶ 58.  Thus, plaintiff suffered no injury from proposed defendant Konkol's suggestion to raise

fees for the types of appeal he commonly files.  Second, regarding the Historic Review

Commission appeal fee raise, plaintiff does not allege that he would have filed appeals of the

body's decisions, regardless of a fee change.[10]  *See Lujan*, 504 U.S. at 573 (Kennedy, J.,

concurring) (declining to find standing for plaintiffs that had failed to acquire plane tickets or

select a date for their return).  Thus, plaintiff has failed to demonstrate a cognizable injury-in-fact

that arose out of proposed defendant Konkol's actions, and his First Amendment claim

accordingly fails.

### 6.    Claim 6: Procedural Due Process

Plaintiff next argues that defendants' conduct violated his constitutional rights in

violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section

10 of the Oregon Constitution.  Prop. Second Am. Compl. ¶¶ 102-03, ECF 26-1.  First, plaintiff

alleges that defendant Holladay deprived him of "his interest in his good name and reputation,"

defendant Oregon City amplified this injury by broadcasting Holladay's allegedly defamatory

comments, and proposed defendants Konkol and Riggs committed the same violation by

maintaining Oregon City's broadcast systems.  *Id*. ¶¶ 103-05.  Second, plaintiff alleges that

proposed defendants Riggs and Konkol violated his procedural due process rights by "depriving

Plaintiff of the draft minutes of the February 6, 2019" meeting where defendant Holladay's

allegedly slanderous statements were made.  *Id.* ¶ 106.  Plaintiff adds that if these draft minutes

were published, he could pursue an additional libel claim and procedural due process claim

against certain defendants.  *Id.*

### a.    Legal Standard

To state a procedural due process claim, a plaintiff "must allege (1) a liberty or property

interest protected by the Constitution; (2) a deprivation of the interest by the government; [and]

---

[10] Plaintiff does not allege that he has filed any appeals of the Historic Review Commission's decisions in the past, nor does he allege that he will do so in the future as part of his representation (of himself or other clients).  *See generally* Prop. Second Am. Compl., ECF 26-1.

(3) lack of process." *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (quotation and

citation omitted).  Property interests "are created and their dimensions are defined by existing

rules or understandings that stem from an independent source such as state law—rules or

understandings that secure certain benefits and that support claims of entitlement to those

benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

      The Supreme Court has established that an alleged injury to an individual's reputation, on

its own, is not a deprivation of a liberty interest that can sustain a procedural due process claim.

*Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (citing *Paul v. Davis*, 424 U.S. 693, 711-12

(1976)).  If, however, the stigmatization occurs in connection with the denial of a "more

tangible" interest, then the plaintiff may advance a "stigma-plus" claim.  *Id.* (citing *Paul*, 424

U.S. at 701-02.  In such a claim, "a plaintiff must show the public disclosure of a stigmatizing

statement by the government, the accuracy of which is contested, *plus* the denial of 'some more

tangible interest[ ] such as employment,' or the alteration of a right or status recognized by state

law." *Ulrich v. City & Cty. of San Francisco*, 308 U.S. 968, 982 (9th Cir. 2002) (emphasis

added, internal citations omitted).[11]

### b.    Analysis: Reputational Injury

      Plaintiff's procedural due process claim regarding reputational injury is defective because

it lacks a cognizable "plus" for the "stigma-plus" test.  At best, plaintiff asserts damages to his

---

[11] In a Notice of Supplemental Authority (ECF 24), plaintiff informed the court of the Ninth Circuit's decision in *Endy v. County of Los Angeles*, 975 F.3d 757 (9th Cir. 2020).  *Endy*, however, expressly adopted the stigma-plus test detailed above: "[P]rocedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of a right or status previously recognized by state law. We have described this standard as the stigma-plus test." *Id.* at 764 (internal citations and quotations omitted) (citing *Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006)).

reputation and stigma, which the Supreme Court has soundly rejected as insufficient to meet the test. *See* Prop. Second Am. Compl. ¶ 103, ECF 26-1; *Paul*, 424 U.S. at 710-12. While plaintiff invokes Article 1, Section 10 of the Oregon Constitution[12] as a means of establishing a "plus" factor, Prop. Second Am. Compl. ¶ 102, ECF 26-1, the Oregon Supreme Court has held that the section merely "guarantees injured persons a remedy in due course of law for their injuries; it is *not* a due process clause." *State v. Hart*, 299 Or. 128 (1985) (en banc) (internal quotations removed, emphasis added).

Plaintiff thus has two problems. First, he cannot rely on the Oregon Constitution alone to create the "plus" for the stigma-plus test if a legally cognizable injury does not otherwise exist. And all of his asserted state law tort claims (and his federal claims) have been rejected, as discussed above.

Second, even assuming that plaintiff has a cognizable injury, to create a plus factor, he still must demonstrate the "alter[ation] or extinguish[ment] [of] one of his known rights." *Endy v. County of Los Angeles*, 975 F.3d 757, 766 (9th Cir. 2020). The case plaintiff provides as supplemental authority, *Endy*, is quite instructive. *Id.* In *Endy*, a father alleged due process violations arising from his inclusion, based on "unfounded" child abuse allegations, in California's Child Welfare Services Case Management System (CWS/CMS). *Id.* at 762. The *Endy* court noted that even if inclusion in CWS/CMS was considered stigmatizing, the plaintiff

---

[12] Article I, Section 10 of the Oregon Constitution reads: "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

had failed to demonstrate how his legal rights or benefits were tangibly burdened.[13]  *Id.* at 766-

68.  Here, plaintiff does not plead *any* facts about how his alleged "plus" injury under the Oregon

Constitution has practically affected any of his liberties beyond reputational injury.  Simply put,

plaintiff has only demonstrated "stigma" and "stigma"—which is *not* "stigma-plus."  *See Paul*,

424 U.S. at 710-12.

Thus, plaintiff has failed to sufficiently plead a procedural due process claim against

defendant Holladay.  Because defendant Holladay's actions do not constitute a violation of

plaintiff's due process rights, plaintiff's due process claims against defendants Oregon City and

OCURA and proposed defendants Konkol and Riggs for broadcasting or recording defendant

Holladay's actions also fail.

### c.    Analysis: Property Injury

Plaintiff's procedural due process claim regarding the draft minutes is also defective

through two independent justifications.  First, plaintiff has failed to establish that he has a

significant property interest in the draft minutes—more specifically, draft minutes that contain

alleged defamation.  *Roth* makes clear that property interests are created "by existing rules or

understandings that stem from an independent source such as state law."  408 U.S. at 577.

Plaintiff fails to cite any applicable law that entitles him to a publication of the draft minutes

---

[13] In reaching this conclusion, the *Endy* court noted that access to CWS/CMS is "limited to specific governmental entities for primarily investigative and case management purposes," which diminished any potential "plus" injuries that the plaintiff could have experienced via a records check as part of an employment application.  The court also dismissed the plaintiff's allegations that his inclusion in CWS/CMS affected his state agency employment, visitation at his daughter's school, and ability to adopt or foster a child because none of the claims were causally connected to his inclusion in CWS/CMS.  Here, in contrast to *Endy*, plaintiff has failed to plead *any* potential plus injuries *other* than a potential violation of the Oregon Constitution that solely stems from alleged reputational injury.

with a perfect word-by-word transcription of the alleged defamation.  In fact, a study of

applicable Oregon law suggests that there is no entitlement:

> (1) The governing body of a public body shall provide for the sound, video or digital recording or the taking of written minutes of all its meetings. *Neither a full transcript nor a full recording of the meeting is required*, except as otherwise provided by law, but the written minutes or recording must give a true reflection of the matters discussed at the meeting and the views of the participants. All minutes or recordings shall be available to the public within a reasonable time after the meeting, and shall include at least the following information:
>> (a) All members of the governing body present;
>> (b) All motions, proposals, resolutions, orders, ordinances and measures proposed and their disposition;
>> (c) The results of all votes and, except for public bodies consisting of more than 25 members unless requested by a member of that body, the vote of each member by name;
>> (d) The substance of any discussion on any matter; and
>> (e) Subject to ORS 192.311 to 192.478 relating to public records, a reference to any document discussed at the meeting.

O.R.S.  192.650 (emphasis added).

The Oregon statute makes clear that written minutes must only provide "a true reflection

of the matters discussed at the meeting and the views of the participants" and expressly holds

that a "full transcript" is not required.  *Id.*  Thus, even if plaintiff held a property interest in the

*draft* minutes of a public meeting,[14] he is not entitled to a perfect word-by-word transcription

that would provide him with the allegedly defamatory statements that he seeks.  Because plaintiff

has failed to establish a valid property interest, his procedural due process claim fails.

---

[14] In supplemental briefing provided after oral argument, plaintiff submitted Oregon statutes concerning tampering.  Not. Second Supp. Auth. 2, ECF 34.  As an initial matter, the court specifically limited its request during oral argument to a completely different issue.  Moreover, plaintiff does not allege tampering or even mention any variation of the word "tamper" in his Proposed Second Amended Complaint.  Plaintiff pleads a *procedural due process* claim and frames his deprivation as the loss of a property interest in printed draft minutes that would grant him access to a libel claim.

Second, plaintiff has presented a catch-22: (1) defendants could publish the draft minutes, and, assuming the minutes contained the alleged defamation, plaintiff would sue them for defamation; or (2) if defendants failed to publish the draft minutes, plaintiff would allege a procedural due process violation and suggest spoliation of evidence. As a preliminary issue, it is unsettled whether Oregon law recognizes spoliation as an independent cause of action. *Classen v. Arete NW, LLC*, 254 Or. App. 216, 221 (2012). "Oregon law generally does not permit a party to recover where the causal nexus between the defendant's conduct and the plaintiff's injury is speculative or uncertain" and "jurisdictions that recognize an independent claim for spoliation of evidence require the plaintiff to have first brought the underlying claim and lost or suffered diminution in its value." *Id.* at 221-22. Even if plaintiff could advance a spoliation claim under the theory that defendants obstructed him from alleging libel, it would fail. Plaintiff seeks the publication of the draft minutes of the February 6, 2019 meeting so that he can transfer the facts underlying his slander claim ("Claim 2") into an additional libel claim. Prop. Second Am. Compl. ¶ 106, ECF 26-1. However, plaintiff's slander claim, which was based on five statements made by defendant Holladay during the February 6, 2019 meeting, fails for the reasons discussed above. *Ante* at 17. A hypothetical libel claim based on the same conduct similarly fails.

Thus, to the extent that plaintiff suggests the possibility of a spoilage of evidence claim, *see* Prop. Second Am. Compl. ¶¶ 106-07, it would also fail. In sum, plaintiff does not possess a cognizable property interest, and his procedural due process claim against proposed defendants Konkol and Riggs similarly fails.

7.      **Claim 7:** *Monell*

Lastly, plaintiff asserts a *Monell* claim against defendants Oregon City and OCURA and proposed defendants Konkol and Riggs.  Prop. Second Am. Compl. ¶¶ 109-13, ECF 26-1. Specifically, plaintiff asserts that defendants' failure to implement adequate policies to monitor the agencies' social media platforms significantly contributed to the constitutional violations he alleges.  *Id.*

a.      **Legal Standard**

To prevail on a § 1983 claim, a plaintiff must establish: (1) a person deprived the plaintiff or caused the plaintiff to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was committed by a person acting under color of state law.  *Hyun Ju Park v. City & Cty. of Honolulu*, 952 F.3d 1136, 1140 (9th Cir. 2020) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  Local governments are "included among those persons to whom § 1983 applies."  *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978).

Because there is no vicarious liability under § 1983, local governments "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id*. at 693.  However, local governments "may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker."  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).

To establish liability for governmental entities under *Monell*, a plaintiff must prove (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, practice, or custom; (3) that this policy, practice, or custom amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy, practice, or

custom is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

### b.    Analysis

For the reasons discussed earlier, all of plaintiff's allegations involving defendant Holladay's speech, including state tort-based claims (libel, slander, false light, and IIED) and federal constitutional claims (First Amendment and procedural due process), fail. Thus, as an initial matter, plaintiff has not met the first *Monell* prong, i.e., he has not demonstrated that he was deprived of a constitutional right. *Dougherty*, 654 F.3d at 900.

Moreover, even assuming, *arguendo*, that plaintiff was deprived of a constitutional right, the remaining *Monell* prongs render his allegations futile. Specifically, plaintiff acknowledges that proposed defendants Konkol and Riggs "*failed* to implement adequate policies or procedures" to safeguard the constitutional rights of others. Prop. Second Am. Compl. ¶ 111, ECF 26-1 (emphasis added). Yet the second prong of *Monell* requires a "policy, practice, or custom" adopted by a local government or its city officials. *Dougherty*, 654 F.3d at 900. And while a "failure to act, train, or supervise" may form the basis of a *Monell* claim, plaintiff fails to plead with any specificity how an alleged policy of indifference toward removing defamation from City Commission meeting recordings constituted the "moving force" behind defendant Holladay's actions. *Id.*

Furthermore, plaintiff's pleadings raise a separate issue: plaintiff's allegations for this claim are akin to the bare recitation of elements disallowed by the Ninth Circuit to substantiate a *Monell* claim. *See Dougherty*, 654 F.3d at 900 (affirming dismissal of a *Monell* claim that "lack[ed] any factual allegations that would separate [it] from the 'formulaic recitation of a cause of action's elements' deemed insufficient by *Twombly*"). Thus, through both substantive and

procedural defects, plaintiff has failed to sufficiently plead a *Monell* claim against defendants Oregon City and OCURA and proposed defendants Konkol and Riggs.

      **C.**    *Foman* **Conclusion**

Futility, on its own, "may support denial of a motion to amend if it is clear that the pleading, as amended, is subject to dismissal and cannot be cured by amendment. *Corinthian Colleges*, 655 F.3d at 995 (citations omitted). It appears that after three attempts, plaintiffs cannot plead a set of facts that would entitle him to relief. Because amendment would be futile, further leave to amend should be denied and this case should be dismissed with prejudice.

## RECOMMENDATIONS

For the reasons set forth above, plaintiff's Motion for Leave to Amend (ECF 26) should be denied, defendant's Motion to Dismiss (ECF 15) should be granted, and this action should be dismissed with prejudice.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Wednesday, November 10, 2021. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

//

//

//

//

40 – FINDINGS AND RECOMMENDATIONS

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  October 27, 2021.


/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge